**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JORGE BADILLO, | : |
| | : |
| Plaintiff, | : |
| | : Civil Action No. 13-1553 (FLW) |
| vs. | : |
| | : |
| VICTOR AMATO, <u>et. al.</u>, | : **OPINION** |
| | : |
| Defendants. | : |

**<u>WOLFSON, United States District Judge</u>:**

Plaintiff Jorge Badillo ("Plaintiff" or "Badillo") is purportedly a priest of the Santeria religion, and as a part of his religious beliefs, Plaintiff claims that he practices ritualistic sacrifice of animals.  The instant civil rights action arises out of charges brought against Plaintiff for animal cruelty by Chief Officer Victor Amato ("Chief Amato) of the Monmouth County Society for the Prevention of Cruelty to Animals (the "SPCA")(collectively, the "SPCA Defendants").  In addition to including the SPCA Defendants in this case, Plaintiff names the following as defendants:  the Monmouth County Sheriff Department, Monmouth County Sheriff Shaun Golden and Monmouth County Sheriff Captain Martin, Monmouth County Assistant Prosecutor John Doe, Monmouth County Prosecutor Christopher Gramiccioni, Monmouth County (the "Monmouth County Defendants"), Officer Garham and Freehold Boro Police Department (the "Freehold Defendants")(collectively, "Defendants").  In his Complaint, Plaintiff alleges that Defendants, collectively, violated his right to religious expression in violation of his First Amendment rights and conspired to

1

deprive Plaintiff of equal protection under the law due to his religious beliefs and practices in violation of 42 U.S.C. §§ 1983 and 1985. Plaintiff also alleges that Defendants violated his right to be free from illegal search and seizure under the Fourth Amendment. Before the Court are three separate motions to dismiss filed, respectively, by the Monmouth County Defendants, the SPCA Defendants and the Freehold Defendants. For the reasons set forth below, the motions to dismiss filed by both the Monmouth County Defendants and the Freehold Defendants are **GRANTED**. The SPCA Defendants' motion is **GRANTED** in part and **DENIED** in part as follows: the SPCA is dismissed as a defendant, as well as the § 1985 claim against Chief Amato. The only claims remaining are Plaintiff's § 1983 claims, pursuant to the First and Fourth Amendments, against Chief Amato.

## BACKGROUND

On a motion to dismiss, the Court recounts the facts as alleged in the Complaint and takes them as true. On March 17, 2011, Captain Martin of the Monmouth County Sheriff's Department responded to Plaintiff's residence with a Canine Officer to execute an unrelated domestic violence warrant and search for a gun that Plaintiff's brother was alleged to have hidden at Plaintiff's home. Compl., ¶ 12. In the course of executing the warrant, Captain Martin and the Officer searched the shed located in Plaintiff's backyard. At the entrance of the shed, they observed dead chickens, and inside the shed, Captain Martin observed Plaintiff's Santeria temple. Id. at ¶ 13. Plaintiff was neither arrested nor cited for any violation of the law by these Monmouth County officers.

On March 18, 2011, Captain Martin allegedly contacted co-defendant Chief Amato of the SPCA, and reported "possible animal cruelty." Id. at ¶14. Later that day, in response to the phone call, the Monmouth County Sheriff's Department dispatched Officer Duda –

who is not named as a defendant – to accompany Chief Amato to investigate the incident. Officer Garham of the Freehold Boro Police Department also accompanied them. Upon arrival, Plaintiff alleges that "Chief Amato [alone] went around the back of the house, opened the gate and let himself in the fenced backyard without permission or a warrant and began taking pictures of the dead animals and the Orishas."[1] Id. at ¶ 16. At the front door, Officers Duda and Garham explained to Plaintiff that "they were there about the chicken." Id. at ¶ 17. Plaintiff explicitly avers that Officers Duda and Garham "stayed on the other side of the yard, did not get involved in photographing the animals or the Orishas and did not enter the temple." Id. at ¶ 38. During this time, Plaintiff's sister, Leyda Badillo, allegedly told Chief Amato that the chickens had been sacrificed as part of their religion. Having not examined any of the animal remains or seized them as evidence, Chief Amato allegedly responded that they "had no right to practice Santeria in Monmouth County or in New Jersey or anywhere in the United States." Id. at ¶ 18. Also, Plaintiff claims that Chief Amato indicated that "he was familiar with Santeria, that he targeted Santeros and had just arrested two Santeros in Spring Lake recently." Id. at ¶ 24.

Ms. Badillo then placed a call to the Monmouth County Prosecutor's Office. Plaintiff avers that the Assistant Prosecutor with whom his sister spoke (named in the Complaint as "John Doe", hereinafter referred as "AP Doe") indicated that Chief Amato was within his rights and that the Monmouth County Prosecutor's Office would not intervene. Id. at ¶ 20.

After photographing the recently sacrificed chickens and "two bird heads that were drying for sacrificial use and a dead pet turtle what was being kept outside," Chief Amato

---

[1]     The Orisha is the deity to which Santerios pray.  See, infra, p. 13.

inquired whether there were "any other animals around." Id. at ¶ 21.  Chief Amato also saw

a live pet rabbit.  Id.  Plaintiff responded that there were three guinea hens that he had

bought from a farm and Chief Amato allegedly demanded to see them.  Thereafter, Plaintiff

alleges that Chief Amato ordered Plaintiff to return the guinea hens and a pet rabbit to a

farm and properly dispose of all of the dead animals on the property.  Id. at ¶¶ 27, 30.

According to Plaintiff, Chief Amato threatened to arrest Plaintiff if Plaintiff did not follow

his instructions.

According to the Complaint, Chief Amato returned the next day and left nine

municipal court summonses for both animal abuse and neglect in Plaintiff's mailbox, and

allegedly, contacted the Asbury Park Press and told them about the summonses.

Apparently, the paper printed an article about Plaintiff's religious practices and his home

address.  Id. at  ¶ 39.  As a result of the article, Plaintiff claims that his home and cars were

vandalized, and that his family was threatened.  Id. at ¶ 40.  Plaintiff also complains that

the unlawful criminal charges adversely effected his ability to adopt two children through

the Department of Children and Family Services.  Id. at ¶ 41.

The criminal charges were resolved in municipal court in Freehold when Plaintiff

pleaded guilty to one count of neglect of the pet rabbit and paid a two-hundred dollar fine,

while the rest of the summonses were dismissed.  Because of this incident, Plaintiff brings

the instant action against Defendants. Plaintiff asserts two causes of action under the Civil

Rights Act: 1) violations of Plaintiff's First Amendment right to free exercise of religion

pursuant to 42 U.S.C. § 1983, and 2) a conspiracy to violate Plaintiff's constitutional rights

under 42 U.S.C. § 1985(3).  On the conspiracy claim, Plaintiff accuses Captain Martin and

Chief Amato of conspiring to deprive his rights, which conspiracy was furthered by

Assistant Prosecutor John Doe, who "had supervisory authority to restrain Chief Amato's behavior but chose to ratify it instead." Compl., ¶ 56. Plaintiff seeks money damages, as well as an injunction to prevent Defendants from targeting Santeros for discriminatory prosecution of animal cruelty laws and undergo sensitivity training. Id. at p.6.

## DISCUSSION

### I.    Standard of Review

Under Rule 12(b)(6), "courts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party." Phillips v. Cnty. Of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008) (citing In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 215-16 (3d Cir. 2002)). However, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The pleading must contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action...." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555) (internal citations and quotations omitted). Thus, a complaint will survive a motion to dismiss if it contains "sufficient factual matter, as accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Twombly, 550 U.S. at 570) (internal citations and quotations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

The Court first turns to the SPCA Defendants' motion to dismiss.

## II.    The SPCA Defendants

### A.    Chief Amato

The thrust of Plaintiff's complaints involves Chief Amato's investigatory conduct. Plaintiff accuses Chief Amato of violating Plaintiff's Fourth Amendment right by entering and searching Plaintiff's dwelling without a warrant or probable cause.  In addition, Plaintiff claims that Chief Amato blatantly and knowingly disregarded Plaintiff's First Amendment right by issuing summonses related to Plaintiff's religious sacrifice of animals, namely, chickens, guinea hens and a turtle.  Moreover, Plaintiff claims that Chief Amato maliciously, with the intent to cause harm to Plaintiff, informed a local paper regarding Plaintiff's religious practice and provided the newspaper with Plaintiff's address.  Chief Amato disputes the allegations, and maintains, at the outset, that he is entitled to qualified immunity.

The doctrine of qualified immunity provides that officers, such as Chief Amato[2], may be shielded from liability in a civil rights suit if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Consequently, the qualified immunity standard is one of "objective legal reasonableness." Harlow, 457 U.S. at 818.  The protection of qualified immunity exists "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation omitted). To determine

---

[2]      While Chief Amato was employed by the SPCA, Plaintiff does not dispute that, like a law enforcement officer, Chief Amato, as a general matter, may claim qualified immunity.

whether a government official is entitled to qualified immunity, a court applies either or both of the two prongs of analysis outlined in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), using the flexible approach endorsed in <u>Pearson</u>. <u>Id.</u> at 228. One prong asks whether "taken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." <u>Saucier</u>, 533 U.S. at 201. The other prong asks "whether the right was 'clearly established' at the time of defendant's alleged misconduct.'" <u>Id.</u> In other words, "qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." <u>Pearson</u>, 555 U.S. at 232 (citation omitted).

Because Plaintiff claims two separate violations of his constitutional rights – Fourth and First Amendment rights – under the qualified immunity analysis, the issue of the alleged illegal search and seizure is separately addressed from the alleged violation of Plaintiff's right to free religious expression.

### 1.     Fourth Amendment - Illegal Search and Seizure

The Court applies the first prong of the <u>Saucier</u> test: whether the facts alleged sufficiently plead that Chief Amato violated Plaintiff's Fourth Amendment right to be free from illegal search and seizure. As a defense to his warrantless entry, Chief Amato claims that exigent circumstances existed which exempted him obtaining a warrant before entering and searching Plaintiff's home.[3]

---

[3]     Contrary to Plaintiff's suggestion that Chief Amato relies on the "plain view doctrine" in justifying his warrantless entry, Chief Amato only invokes the exception of exigent circumstances as his reasoning for foregoing a warrant. Indeed, there is nothing in the pleadings that would lead this Court to find that Chief Amato saw the alleged dead animal carcasses from outside of Plaintiff's property in plain view.

As a preliminary matter, the Court notes that there is no dispute that Plaintiff has a clearly established right to be free from illegal search and seizure by a state actor under the Fourth Amendment.[4]  That Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

U.S. Const. amend. IV.

In the context of a claim for unlawful entry or search, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." See Minnesota v. Olson, 495 U.S. 91, 95 (1990) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). An expectation of privacy is deemed legitimate if the person challenging the search can show that he or she has "both a subjective expectation of privacy and that the expectation is objectively reasonable, that is, one that  society is willing to accept." Warner v. McCunney, 259 Fed. Appx. 476, 477 (3d Cir. 2008) (citing Olson, 495 U.S. at 96-97); see Katz v. United States, 389 U.S. 347, 361 (1967).

Indeed, "[o]ne's home is sacrosanct, and unreasonable government intrusion into the home is 'the chief evil against which the wording of the Fourth Amendment is directed.'" U.S. v. Zimmerman, 277 F.3d 426, 431 -432 (3d Cir. 2002) (citing Payton v. New York, 445 U.S. 573, 585 (1980)). And, the protections afforded by the Fourth Amendment extend not

---

[4]     The Fourth Amendment applies to the states through incorporation by the Fourteenth Amendment. See Oliva-Ramos v. AG of the United States, 694 F.3d 259, 276 (3d Cir. 2012).

only to a person's home, but also to the curtilage surrounding the property. <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 518 -519 (3d Cir. 2003). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." <u>U.S. v. Dunn</u>, 480 U.S. 294, 300 (1987).

In general, a warrantless entry into a person's house is *per se* unreasonable. <u>U.S. v. Stabile</u>, 633 F.3d 219, 230 (3d Cir. 2011) (citation omitted). Nonetheless, there are certain exceptions to this rule, such as consent or probable cause accompanied with exigent circumstances which justify the intrusion. <u>U.S. v. Coles</u>, 437 F.3d 361, 365 -366 (3d Cir. 2006) (citing <u>Steagald v. United States</u>, 451 U.S. 204, 211 (1981)). Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. <u>Coles</u>, 437 F.3d at 366; <u>Warden v. Hayden</u>, 387 U.S. 294, (1967) ("Exigent circumstances are present where a suspect is likely to disappear or there is a threat to the safety of officers or the public"). "[I]n the absence of exigent circumstances the warrantless entry of a private dwelling place . . . is unlawful." <u>U.S. v. Williams</u>, 612 F.2d 735, 738 (3d Cir. 1979); <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750 (1984).

It is important to emphasize that both exigent circumstances **<u>and</u>** probable cause must exist to justify the warrantless intrusion. <u>Coles</u>, 437 F.3d at 365. To that end, probable cause obtains whenever reasonably trustworthy information or circumstances within an officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested. <u>Draper v. United States</u>, 358 U.S. 307, 313 (1999); <u>United States v. Myers</u>, 308 F.3d 251,

255 (3d Cir. 2002); United States v. Laville, 480 F.3d 187 (3d Cir. 2007). While "probable cause . . . requires more than mere suspicion...it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).

In this case, while Plaintiff accuses Chief Amato of entering Plaintiff's home without a warrant, Chief Amato maintains that he had to conduct a search of Plaintiff's property to ensure that the lives of additional animals were not at risk of imminent harm. At this pleading stage, the Court is satisfied that the Complaint alleges sufficient factual matter to call into question the reasonableness of Chief Amato's actions.[5]

Plaintiff alleges that Chief Amato, after being informed by Captain Martin that there were possible violations of animal cruelty laws, entered Plaintiff's home without a warrant.[6] While the Court finds that Chief Amato, arguably, had probable cause to believe acts of animal cruelty were occurring because of Captain Martin's tip, see Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006); Hart v. Parks, 450 F.3d 1059, 1063 n.3 (9th Cir. 2006); Tavernaris v. City of Beaver Falls, No. 07-127, 2008 U.S. Dist. LEXIS 49654, at *5 (W.D Pa. Jun. 25, 2008) (finding that officers are "permitted to rely on the reports of other officers

---

[5]     Chief Amato relies on Fabrikant v. French, 691 F.3d 193, 212 (2d Cir. 2012), for the proposition that animal control authorities should be entitled to qualified immunity because it is reasonable for officers to enter one's home when animals were reportedly abused on the premise. However, this case is clearly distinguishable because the officers in Fabrikant had secured a search warrant prior to entering that plaintiff's property. Id. at 200. In this case, Chief Amato allegedly failed to obtain a warrant before entering Badillo's dwelling.

[6]     There is no dispute that Plaintiff's backyard is a part of the curtilage surrounding Plaintiff's property, and that Plaintiff had a legitimate expectation of privacy on that space.

. . . when determining whether probable cause was present"), taking the allegations in the Complaint as true, nothing in the pleadings suggest that any exigent circumstances existed. Indeed, allegedly, the animals observed by Captain Martin were already sacrificed, and their carcasses were laid by the entrance surrounding Plaintiff's shed. There are no allegations or suggestions that Plaintiff was conducting any more acts of animal cruelty such that imminent harm to other animals was likely to occur. And, more importantly, it was alleged that Captain Martin contacted Chief Amato ***a day after*** he made the observations. See Compl., ¶ 14. This allegation suggests a lack of urgency on the part of the officer. Moreover, Plaintiff alleges that Chief Amato was hostile towards Plaintiff's religious practices, which calls into question the Chief's motive. While sometimes the information available at the pleading stage could permit the Court to make a definitive ruling as to whether exigent circumstances existed, and correspondingly, whether an officer is entitled to qualified immunity, based on Plaintiff's allegations, here, that issue cannot be determined at this juncture. Thus, the Court finds because Plaintiff has sufficiently stated a claim that Chief Amato's warrantless entry violated his clearly established Fourth Amendment constitutional right, Chief Amato, at this time, is not entitled to qualified immunity on this claim.

### 2. First Amendment - Free Religious Expression

The question of immunity related to Plaintiff's First Amendment claim turns on the second prong of the Saucier test: whether Plaintiff has a clearly established right to conduct ritualistic sacrifice of animals as a part of his Santeria religion. Notably, on this motion, Chief Amato does not dispute that the conduct alleged – i.e., issuing summonses or expressing that Plaintiff "had no right to practice Santeria in Monmouth County or in New

Jersey or anywhere in the United States" – may have violated a constitutional right. Rather, Chief Amato submits that because there have been no cases or statutes, under the constitutional jurisprudence, explicitly pronouncing the right for Santerios to practice ritualistic sacrifices, that right has not been clearly established.[7]  On the other hand, Plaintiff argues that the Supreme Court, in <u>Church of the Lukumi Babalu Aye v. Hialeah</u>, 508 U.S. 520 (1993), has recognized Santeria as a religion and its practice of animal sacrifice.  The parties disagree on the impact of <u>Lukumi</u> on this case.

In <u>Lukumi</u>, the City of Hialeah in Florida adopted a series of municipal ordinances, essentially prohibiting the practice of animal sacrifice for religious purposes after the Church of Lukumi Bablu Aye, a Santeria congregation, attempted to erect a temple.  The Supreme Court found the ordinances unconstitutional because they evidenced faith-based discrimination.  By pointing to the Supreme Court's ultimate holding, Chief Amato argues, here, that the Court did not establish –  as a matter of constitutional right – that a person of the Santeria faith can practice animal sacrifice. Instead, Chief Amato claims that the Supreme Court's decision was narrow in scope; in that, the Court only invalidated the ordinances.   The Court disagrees.

Throughout its decision, the Supreme Court was very clear regarding the recognition of the Santeria religion and its practices.  Indeed, the Court explained that the "basis of the Santeria religion is the nurture of a personal relation with the *orishas*, and one of the principal forms of devotion is an animal sacrifice."  <u>Lukumi</u>, 508 U.S. at 524.  The Court

---

[7]     I note that the SPCA Defendants engage in an analysis of the constitutionality of New Jersey's animal cruelty laws, N.J.S.A. 4:22-17.  However, because Plaintiff does not challenge the New Jersey statute at issue, the Court need not address it.

went onto to highlight that animal sacrifice plays a key role in Santeria:

> According to Santeria teaching, the *orishas* are powerful but not immortal. They depend for survival on the sacrifice. Sacrifices are performed at birth, marriage and death rites, for the cure of the sick, for the initiation of new members and priests, and during an annual celebration. Animals sacrificed in Santeria rituals include chickens, pigeons, doves, ducks, guinea pigs, goats, sheep, and turtles. The animals are killed by cutting of the carotid arteries in the neck. The sacrificed animal is cooked and eaten, except after healing and death rituals.

Id. at 525. Having recognized Santeria as a religion deserving of protection under the First Amendment, the Supreme Court remarked that "[a]lthough the practice of animal sacrifice may seem abhorrent to some, 'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" Id. at 530 (quoting Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 714 (1981). Crucially, the Court acknowledged that "[g]iven the historical association between animal sacrifice and religious worship . . . petitioners' assertion that animal sacrifice is an integral part of their religion cannot be deemed bizarre or incredible." Id. (internal quotations and citations omitted). Based in part on that rationale, the Supreme Court held that the municipal ordinances at issue cannot withstand constitutional scrutiny.

Given the case law on this issue, my next inquiry is whether Santeria's ritualistic practices constitute a clearly established right. I note that a right is clearly established for qualified immunity purposes where its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202; Williams v. Bitner, 455 F.3d 186, 191 (3d Cir.2006). In determining whether a right has been clearly established, the court must define the right allegedly violated at the appropriate level of specificity. Williams, 455 F.3d at 191 (citing Wilson v. Layne, 526 U.S.

603, 615 (1999)). In some cases, even though there may be no previous precedent directly on point, an action can still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with obvious clarity. Williams, 455 F.3d at 191 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)); Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) cert. denied, 133 S. Ct. 41 (2012).

In my view, the Supreme Court's language and reasoning not only establishes the legitimacy of the Santeria faith, but also its unique practice relating to the ritualistic sacrifice of certain animals. While there has been little case law since Lukumi directly answering the issue presented in this case, there has been at least one appeals court, the Fifth Circuit, which has recognized the importance of animal sacrifice to Santeria's religious beliefs. See Merced v. Kasson, 577 F.3d 578, 582 (5th Cir. 2009) ("[H]ome sacrifice is not only the norm, but a crucial aspect of Santeria, without which Santeria would effectively cease to exist."). As the Third Circuit has advised, it is not an impediment to find that a right is clearly established in the absence of the Supreme Court addressing a specific circumstance; rather, so long as a decision "from the Supreme Court . . . support[s] the principles underlying the right asserted by [Plaintiff]," this Court may find that such a right is clearly defined. Williams, 455 F.3d at 194. Accordingly, based on the foregoing reasoning, I find that Plaintiff's right to practice the Santerian ritual of sacrificing certain types of animals, within the strictures and constraints of the religion, is a clearly established right under qualified immunity. See Lukumi, 508 U.S. at 526 ("Sacrifices are performed at birth, marriage and death rites, for the cure of the sick, for the initiation of new members and priests, and during an annual celebration. Animals sacrificed in Santeria rituals include chickens, pigeons, doves, ducks, guinea pigs, goats, sheep, and turtles.").

Furthermore, Chief Amato is the chief law enforcement for the SPCA, an entity in the state that deals exclusively with animal cruelty, and tasked to conduct certain investigations and to issue summonses. In that regard, it is reasonable to find that Chief Amato would be familiar with the Supreme Court case law concerning the subject of animal cruelty, albeit in a religious context. And, moreover, Chief Amato should necessarily be aware of the illegality of punishing or discriminating against a person because of his religion. Thus, based upon the allegations, it is the conclusion of this Court that Chief Amato should have reasonably known that by charging Plaintiff, who is a Santeria priest, with animal cruelty, absent any allegations that Plaintiff did not conduct these killings in accordance with the requirements of his religion, would violate Plaintiff's clearly established right to conduct sacrificial rituals. Accordingly, Chief Amato is not entitled to immunity at this time.

Finally, I address the last point made by the SPCA Defendants. These defendants argue that if Plaintiff's freedom of religious claims were viable, he could kill countless animals at his home and elsewhere, all in the name of the free exercise of his faith, and in so doing would render the New Jersey animal cruelty statute a nullity. I disagree with the SPCA Defendant's conclusion. Although I have found that – based on the allegations – Plaintiff has sufficiently pled that he had a constitutional right to perform certain animal sacrifices for religious purposes, that right is not unfettered. The Supreme Court explained that, according to the Santeria faith, only certain animals, e.g., turtles, chickens and guinea hens, are used for sacrificial means, and the manner in which those animals are sacrificed must be humane. Importantly, Plaintiff alleges that the performance of the rituals at issue in this case was consistent with known Santeria beliefs. See Compl., ¶¶ 33-34. What Plaintiff claims here is that Chief Amato knowingly issued summonses under the New

Jersey animal cruelty laws in furtherance of his disagreement with Plaintiff's religion and that Chief Amato deliberately targeted Plaintiff because of his religious beliefs. See Compl., ¶ 18 (Chief Amato allegedly stated that Plaintiff "had no right to practice Santeria in Monmouth County or in New Jersey or anywhere in the United States"); ¶ 24 (Chief Amato indicated that "he was familiar with Santeria, that he targeted Santeros and had just arrested two Santeros in Spring Lake recently"). As a constitutional matter, the First Amendment forbids an official to "disapprove of a particular religion" or to discriminate and prohibit certain "conduct because it is undertaken for religious purposes." Lukumi, 508 U.S. at 532. That said, however, if Plaintiff's conduct was not in conformance with his religion, he may not enjoy the protections of the First Amendment. That factual issue will be resolved at later stages of this case. At this juncture, based on Chief Amato's alleged actions, Plaintiff has sufficiently stated a claim under the First Amendment pursuant to § 1983.

### 3.     Conspiracy under § 1985

Unlike his § 1983 claim, Plaintiff fails to state a claim for conspiracy against Chief Amato under § 1985. Section 1985(3) permits a party to bring an action to recover for injuries incurred by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To establish a claim for civil conspiracy, a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen

of the United States. <u>Lake v. Arnold</u>, 112 F.3d 682, 685 (3d Cir. 1997).

Here, the Complaint alleges that Captain Martin "was acting under color of state law and within his official capacity as a [Captain] with the Monmouth County Sheriff's Office when he contacted Chief Amato to report possible animal abuse." Compl., ¶ 45. Thereafter, Plaintiff alleges that subsequent actions taken by Chief Amato violated his civil rights. <u>See Id.</u> at ¶¶ 48-49. Then, in a conclusory manner, Plaintiff claims that "Defendants [Captain] Martin and Chief Amato conspired to deprive Plaintiff of equal protection under the law due to his religious beliefs and practices." <u>Id.</u> at ¶ 54. These allegations fall short of pleading a conspiracy. Plaintiff has not alleged any facts which would support the claim that any agreement existed between Captain Martin and Chief Amato. Indeed, to successfully allege the agreement aspect of a § 1985(3) conspiracy, Plaintiff must allege sufficient factual matter to suggest an actual agreement was made for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. <u>Twombly</u>, 550 U.S. at 556-57. The Complaint contains no factual allegations to support a finding that a conspiracy was entered into, or that any such conspirator acted with the requisite purpose of invidious class-based discrimination. Rather, Plaintiff's insistence that these co-conspirators had a prior agreement to violate his religious rights is based purely on his supposition and conjecture. Plaintiff, therefore, fails to state a claim against Chief Amato under § 1985(3), and the claim is dismissed without prejudice.

**B.    Monmouth County SPCA**

At the outset, it is significant to note that the Complaint is devoid of any allegations of wrongdoing against the SPCA, let alone a <u>Monell</u> claim. Notwithstanding this deficiency,

Plaintiff attempts to amend his Complaint through his brief, alleging that the SPCA failed to adequately train or supervise Chief Amato given his conduct and his interactions with Plaintiff. An amendment made in this manner is clearly forbidden. See Taylor v. Sanders, No. 12-3890, 2013 U.S. App. LEXIS 16343, at *6-7 (3d Cir. Aug. 7, 2013) (finding that a plaintiff may not amend his complaint through arguments in his brief). Nevertheless, even taking those allegations as true, Plaintiff has failed to state a Monell Claim against the SPCA.

Under 42 U.S.C. § 1983, municipal defendants cannot be held liable under a theory of respondeat superior; municipal liability only arises when a constitutional deprivation results from an official custom or policy. Monell v. Department of Social Servs. of City of New York, 436 U.S. 658, 691-94 (1978). Furthermore, a municipality's failure to train or supervise police officers only gives rise to a constitutional violation when that failure amounts to deliberate indifference to the rights of persons with whom the police come into contact. See Jewell v. Ridley Twp., 497 Fed. Appx. 182, 186 (3d Cir. 2012) ("A municipality may be liable for its failure to supervise only if it reflects a policy of deliberate indifference to constitutional rights."); see also City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). In this context, the Third Circuit has recognized that a failure to train, discipline or control can only form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate. See Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997). Importantly, a mere showing (1) of the shortcomings of an individual; (2) that an otherwise sound training

program occasionally was negligently administered; or (3) without more, that better training would have enabled an officer to avoid the injury-causing conduct does not rise to the level of deliberate indifference. See Simmons v. Philadelphia, 947 F.2d 1042, 1060 (3d Cir. 1991); L.S. v. Mount Olive Bd. of Educ., 765 F. Supp. 2d 648, 660 (D.N.J. 2011).

Here, Plaintiff has not pled any custom or policy which caused the alleged violation of his rights, has not alleged facts related to the inadequacy of any training program, and more importantly, has not alleged any conduct by the SPCA that would be deemed as deliberately indifferent to Plaintiff's constitutional rights. In short, the only allegation Plaintiff predicates his failure-to-train theory is that better training would have enabled Chief Amato to avoid the alleged injury-causing conduct. That is not sufficient under § 1983 jurisprudence. In fact, recognizing that he needs additional factual allegations to support his claim, Plaintiff suggests that having access to the SPCA's training materials during discovery would surely reveal the basis of his claim. Under Towmbly, Plaintiff cannot plead threadbare allegations couched in a conclusory manner and hope to uncover more facts during discovery. Accordingly, this claim against the SPCA is dismissed without prejudice.

## III.    The Monmouth County Defendants

To begin, I note that while Plaintiff names various Monmouth County municipal entities, officers, and prosecutors as defendants, the Complaint only includes allegations of wrongdoing against Captain Martin and AP Doe. In that regard, Plaintiff claims that Captain Martin violated Plaintiff's First Amendment rights by contacting the SPCA to report "possible" animal cruelty, and without any factual support, alleges that Captain Martin conspired to violate  rights with Chief Amato. Importantly, Plaintiff does not allege that Captain Martin arrested him, cited him with any violation of the law, or took any other

direct action against him. In addition, Plaintiff alleges that the AP Doe violated Plaintiff's rights when he "refused to intervene to stop Chief Amato's illegal entry into Plaintiff's property and illegal prosecution of Plaintiff due to his religious belief." In other words, Plaintiff seeks to hold AP Doe liable for failure to exercise his alleged supervisory authority over Captain Amato. These allegations form the basis of the entirety of Plaintiff's Complaint against the Monmouth County Defendants.

## A. Captain Martin

With regards to Captain Martin, the Court finds that he is entitled to qualified immunity as to the claims for money damages under § 1983. To reiterate, the doctrine of qualified immunity provides that police officers may be shielded from liability in a civil rights suit if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Here, Plaintiff claims Captain Martin violated his constitutional rights by disregarding Plaintiff's religious beliefs when he informed Chief Amato that animals had been sacrificed in a religious ceremony. Plaintiff devotes much of his opposition paper arguing that under the relevant Supreme Court case law, he has a constitutional right to sacrifice animals as a part of his religious practices. However, regardless of Plaintiff's constitutional right, Captain Martin's conduct of informing Chief Amato of Plaintiff's ritual did not violate Plaintiff's First Amendment rights. Indeed, merely informing of a potential violation of the law does not violate any constitutional rights to which Plaintiff is entitled. See, e.g., Anton v. Getty, 78 F.3d 393, 396 n.5 (8th Cir. 1995)(finding that qualified immunity is appropriate when the effect of filing a report by an officer is merely to trigger an inquiry by another officer that may or may not lead to an investigation); Ray v. Pickett,

734 F.2d 370 (8th Cir. 1984); <u>Mee v. Ortega</u>, 967 F.2d 423, 428 (10th Cir. 1992); <u>Scotto v. Almenas</u>, 143 F.3d 105, 111-13 (2d Cir. 1998); <u>see</u> <u>also</u> <u>Sand v. Steele</u>, 218 F. Supp. 2d 788, 790 (E.D. Va. 2002)(finding that the officers "were merely living up to their duty as correctional officers to report a violation of prison policy by an inmate," and "[t]he doctrine of good faith qualified immunity shields [those officers from] performing discretionary functions from civil liability . . . ."). Put differently, Captain Martin's "report" – irrespective of whether he knew that Plaintiff was exercising his religious beliefs – to Chief Amato merely triggered Chief Amato's subsequent investigation. As such, Plaintiff has failed to allege a constitution violation on the part of Captain Martin.

Likewise, for the identical reasons why Plaintiff failed to state a claim against Chief Amato for conspiracy under § 1985, Plaintiff fails to state a conspiracy claim against Captain Martin. <u>See</u>, <u>supra</u>, Section IIA(3). Accordingly, because the Court finds that Plaintiff has failed to properly allege that Captain Martin violated his constitutional rights, under either §§ 1983 or 1985, Plaintiff's request for injunctive relief against Captain Martin is dismissed as well.

## B.    Assistant Prosecutor John Doe

Plaintiff alleges that the Monmouth County Prosecutor is the highest law enforcement authority in Monmouth County and has supervisory authority over all law enforcement agencies in the County, including the Sheriff's Office and the County SPCA.<sup>8</sup> Therefore, Plaintiff accuses Prosecutor Gramiccioni and AP Doe of violating Plaintiff's First

---

<sup>8</sup>    For the purposes of this motion, Defendants do not dispute that the Monmouth County Prosecutor has supervisory authority over the Sheriff Department or the County SPCA.

Amendment rights when they "refused to intervene to stop Chief Amato's illegal entry into Plaintiff's property and illegal prosecution of Plaintiff due to his religious beliefs." Compl., ¶ 51. In other words, Plaintiff seeks to hold these prosecutors liable under § 1983 for failure to exercise their purported supervisory authority over Chief Amato.

A municipality's failure to train or supervise police officers only gives rise to a constitutional violation when that failure amounts to deliberate indifference to the rights of persons with whom the police come into contact. See Jewell v. Ridley Twp., 497 Fed. Appx. 182, 186 (3d Cir. 2012) ("A municipality may be liable for its failure to supervise only if it reflects a policy of deliberate indifference to constitutional rights."); see also City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). Here, Plaintiff has not stated a proper failure-to-supervise claim under § 1983. The Complaint only alleges that the Monmouth County Prosecutor, through AP Doe, refused to intervene in Chief Amato's official investigation of animal abuse. This allegation does not meet the deliberate indifference standard necessary to sufficiently state a claim. Plaintiff did not allege that the prosecutors established or approved a policy, practice or custom causally related to constitutional violations alleged in this case. Nor did Plaintiff allege that the prosecutors' inaction somehow communicated a message of approval to Chief Amato. Rather, the allegation as to the prosecutors is that they failed to exercise their supervisory powers in a fashion which would protect the constitutional rights of Plaintiff. However, such allegation cannot be the sole basis of a failure-to-supervise claim under Monell, see C.H. ex rel. Z.H. v. Olivia, 226 F.3d 198, 202 (3d Cir. 1995), and therefore, it is dismissed without prejudice.

## C. The Monmouth County Municipal Defendants

While not explicitly alleged in the Complaint, Plaintiff explains in his opposition

papers that he brings a <u>Monell</u> claim against Monmouth County, Monmouth County Prosecutor, Sheriff Shaun Golden[9] and Monmouth County Sheriff Department (collectively, the "Municipal Defendants"), for failure to adequately train Captain Martin. However, Plaintiff cannot hold the Municipal Defendants liable because the Court has already found that there is no violation of Plaintiff's constitutional rights on the part of Captain Martin. In other words, since there was no violation in the first place, there can be no claims against the municipality for deprivation. <u>Mulholland v. County of Berks</u>, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (finding that "if a municipal employee inflicted no constitutional injury, it is inconceivable that the municipality could be liable") (internal quotations and citations omitted). Furthermore, based on the pleading standard, Plaintiff fails to allege any custom or policy instituted by the Municipal Defendants which caused any violations of his rights and Plaintiff has not alleged any facts whatsoever related to an inadequacy of any training program. Nothing Plaintiff has put forth on the part of the Municipal Defendants, neither in his Complaint or Opposition papers, could be deemed as deliberately indifferent to Plaintiff's constitutional rights. Thus, this claim is dismissed without prejudice against these defendants.

## IV. The Freehold Defendants

### A. Officer Garham

To emphasize, Plaintiff only alleges that Officer Garham escorted Chief Amato to Plaintiff's home in order to investigate the alleged animal abuse. Plaintiff, specifically, points out that Officer Garham neither participated nor assisted in the actual investigation

---

[9] In the Complaint, there are no allegations of Sheriff Golden's involvement in this incident. Plaintiff attempts to clarify the Sheriff's role in his opposition papers.

by Chief Amato. Compl., ¶ 38. Rather, Plaintiff's theory against Officer Garham is that by accompanying Chief Amato and refusing to intervene in the investigation, Officer Garham violated Plaintiff's rights. Taking Plaintiff's allegations as true, because Officer Garham was engaged in legitimate law enforcement activity, he did not violate Plaintiff's constitutional rights. In that regard, Officer Garham is entitled to qualified immunity.

I need not repeat the law of qualified immunity as I have delineated the standard, supra. Officer Garahm's alleged action of escorting Chief Amato was not unlawful. Plaintiff did not allege that Officer Garham issued any summons or, importantly, that the officer entered the premise without permission. Indeed, the only state actor that Plaintiff accused of entering his home without a valid search warrant or consent was Chief Amato. See Compl., ¶¶ 16-17. Plaintiff also does not allege that Officer Garham was involved in the investigation of the alleged animal sacrifice. Merely accompanying Chief Amato to an investigation does not suffice to hold Officer Garham accountable for any constitutional wrong. Regardless whether the actual investigation was lawful, Officer Garham reasonably believed that by accompanying another officer to further a police investigation would not be violative of Plaintiff's constitutional rights, particularly since he was not involved in the investigatory process. See, e.g., Bostrom v. N.J. Div. of Youth & Family Servs., No. 11-1424, 2013 U.S. Dist. LEXIS 121445, at *54-55 (D.N.J. Aug. 16, 2013) (escorting officers are entitled to qualified immunity). Indeed, Plaintiff's insistence that Officer Garham's "acquiescence" to Chief Amato's alleged wrongful conduct does not subject the officer to liability. The Court finds that under the qualified immunity standard, a reasonable officer in Officer Garham's position would have acted the same. Accordingly, Plaintiff's § 1983 claim against Officer Garham is dismissed as the officer is entitled to immunity. Similarly,

Plaintiff's injunctive relief against Officer Garham is dismissed for failure to properly state a constitutional violation on the part of the officer.

I note that Plaintiff contends that he has met the pleading requirements to state a conspiracy claim under § 1985(3) against Officer Garham. I reject that argument. For one, Plaintiff makes no allegations whatsoever in the Complaint that Officer Garham is a co-conspirator. Even assuming Officer Garham was involved in the conspiracy, this claim fails for the same reason why Plaintiff's § 1985 claim against Captain Martin was insufficiently pled: Plaintiff has failed to allege any agreement between the co- conspirators – a crucial element of § 1985(3). This claim is, therefore, also dismissed for failure to state a claim.

### B.    The Freehold Police Department

For much of the same deficiencies that plague Plaintiff's claims against other municipal defendants, Plaintiff fails to state a <u>Monell</u> claim against the Freehold Police Department. First and foremost, Plaintiff does not allege any wrongdoing on the part of the Police Department in his Complaint. That, in and of itself, is a reason to dismiss this claim against the Department. Next, while Plaintiff accuses the Freehold Police Department of failing to train Officer Garham in his opposition papers, that accusation fails to hold water because, for one, Plaintiff has not properly stated an underlying claim against Officer Garham, and more importantly, Plaintiff makes no allegation of any policy or custom to which Officer Garham followed that violated any of Plaintiff's constitutional rights. Thus, Plaintiff fails to state a <u>Monell</u> claim against the Freehold Police Department.

Finally, I note that all dismissals in this case are without prejudice. While I find that Plaintiffs have not stated a claim against any of the defendants, except for Chief Amato, throughout the Complaint, Plaintiff avers that each defendant had knowledge that Plaintiff

is a Santerio and that despite that knowledge, they persisted in assisting, permitting or failed to supervise or train Chief Amato, which led to the violation of his constitutional rights. Should Plaintiff discover additional facts during discovery that may support his now-dismissed claims, he may move to amend his Complaint before the Magistrate Judge at that time.

## CONCLUSION

For the foregoing reasons, the motions to dismiss filed by both the Monmouth County Defendants and the Freehold Defendants are **GRANTED**. Those defendants are dismissed. The SPCA Defendant's motion is **GRANTED** in part and **DENIED** in part as follows: the SPCA is dismissed as a defendant, as well as § 1985 claim against Chief Amato. The only claims remaining are Plaintiff's § 1983 claims, pursuant to the First and Fourth Amendments, against Chief Amato. All dismissals are without prejudice.

Date: January 28, 2014

/s/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge